IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-01479-PAB-BNB

CORTEZ COX,

      Plaintiff,

v.

LOCKHEED MARTIN CORPORATION, a Maryland Corporation also known as
Lockheed Martin Space Systems Company,

      Defendant.

_____

### ORDER
_____

      This matter is before the Court on the Motion for Summary Judgment [Docket

No. 38] filed by defendant Lockheed Martin Corporation ("Lockheed Martin").  The

motion is fully briefed and ripe for disposition.

## I.  BACKGROUND[1]

      This case arises out of plaintiff Cortez Cox's employment with Lockheed Martin.

Mr. Cox, who is African American, worked for Lockheed Martin from March 22, 1993

until his termination on January 12, 2011.  Mr. Cox began his employment as a quality

inspector and was promoted to quality assurance senior engineer in December 2005.

      As a Lockheed Martin employee, Mr. Cox was required to participate in the

company's Performance Management ("PM") process.  The PM process allows

Lockheed Martin to measure an employee's yearly performance against the employee's

_____

      [1]The following facts, unless otherwise indicated, are not in dispute.

own objectives and those provided by management.  The PM process requires that all Lockheed Martin employees enter two sets of objectives into a database called LMPeople.  First, employees are required to provide a list of personal objectives they hope to accomplish during the calendar year.  Second, employees must choose objectives to complete from a "flow-down" list provided by Lockheed Martin's managers.

For his 2009 personal objectives, Mr. Cox stated that he would attempt to "remain current [with his] required training and complete [his] time card before the end of the week."  Docket No. 38-11 at 2.  After reviewing these personal objectives, Chris Fortin, a quality assurance manager, informed Mr. Cox that his objectives for the 2009 calendar year were inadequate and requested that Mr. Cox input additional objectives. *Id*. at 3.  Mr. Cox declined to provide additional objectives and stated that he had his "objectives listed."  *Id*. at 3-4.

On April 1, 2009, Amy Gawlik, a human resources ("HR") business partner, spoke with Kelly Triplett, a manager in HR, about Mr. Cox's reluctance to provide additional objectives.  *Id*.  Ms. Triplett told Ms. Gawlik to enter Mr. Cox's objectives for 2009 with the help of a quality assurance manager and schedule a subsequent meeting with Mr. Cox to implement necessary changes.  *Id*.  On April 2, 2009, Ms. Gawlik sent Mr. Cox an email advising him that she had made changes to his PM process file.  *Id*. On April 6, 2009, Mr. Cox requested that Ms. Gawlik remove all the changes.  As a result, no further changes were made to Mr. Cox's PM process file for the 2009 calendar year.  *Id*. at 5-6.

In addition to the PM process, Lockheed Martin conducts an individualized Performance Assessment and Development Review ("PADR") for all of its employees at the end of the calendar year. *See* Docket Nos. 38-12, 38-19. For the 2009 calendar year, Jeanne Kerr, a quality assurance manager, conducted Mr. Cox's PADR. Docket No. 38-12; Docket No. 38-15. In the PADR, Ms. Kerr concluded that Mr. Cox was a "Successful Contributor" and a "competent performer and valued team player, who meets the objectives and expectations of [his] position" based on his technical performance. Docket No. 38-12 at 1. However, with respect to non-technical aspects of his employment, Ms. Kerr noted that Mr. Cox was "difficult to communicate with and refuse[d] to follow clearly communicated corporate command media requirements." *Id*. Specifically, Ms. Kerr found that Mr. Cox refused to attend weekly staff meetings – including mandatory meetings – and found that his "behavior associated with the Performance Management (PM) process [in 2009] was unacceptable and in direct conflict with the Lockheed Martin performance attributes." *Id*. The PADR recommended, among other things, that Mr. Cox attempt to improve his interpersonal skills by attending organizational meetings, by responding to communications with management in a timely manner, and by including "objectives (those flowed down to him from management as a minimum)" when completing "the 2010 Performance Management process." *Id*.

On December 10, 2009, Ms. Kerr and Mr. Fortin held a meeting with Mr. Cox to discuss his PADR. Docket No. 38-2 at 6 (Cox Dep. 64:10-18); Docket No. 38-15 at 1. During this meeting, Ms. Kerr and Mr. Fortin informed Mr. Cox that if he failed "to do what is identified in [the PADR's] areas of improvement," he could be subject to

3

discipline, including placement on a personal improvement plan ("PIP").[2]  Docket No.

38-15 at 1.

On March 15, 2010, as part of the PM process, Ms. Kerr emailed flow-down

objectives to her subordinates and asked them to enter both their personal and flow-

down objectives by March 26, 2010.  Docket No. 38-8 at 1.  The flow-down list provided

by Ms. Kerr identified five objectives all of her subordinates had to perform and allowed

each employee to choose three additional objectives.  *Id*.  Mr. Cox did not include any

of the objectives provided by Ms. Kerr in his PM process file.  Docket No. 38-2 at 10

(Cox Dep. 84:9-20).  Instead, Mr. Cox listed the same objectives he had in 2009,

namely, keeping his training up to date and completing his timecard before the end of

the week.  Docket No. 38-3 at 1 (Cox Dep. 85:16-19).  On March 26, 2010, Ms. Kerr

told Mr. Cox that his flow-down objectives were inadequate and requested a meeting to

discuss his objectives.  Docket No. 38-13 at 1.  This meeting, however, never took

place.  Docket No. 38-3 at 1 (Cox Dep. 86:5-14).

On May 6, 2010, Ms. Kerr contacted Mr. Cox to remind him that the objectives

he listed in the PM Process did not meet her expectations.  Docket No. 38-9 at 2.  Ms.

Kerr explained to Mr. Cox that all employees were expected to complete the PM

process and that his failure to enter his objectives would result in a PIP.  *Id*.  On May

10, 2010, Ms. Kerr again reminded Mr. Cox that he was required to modify his PM

---

[2]Mr. Cox does not deny that Mr. Fortin and Ms. Kerr told him about the possibility of a PIP; however, Mr. Cox testified that he was wearing headphones during the meeting so he might not have heard his managers' criticisms.  Docket No. 38-2 at 9 (Cox Dep. 74:11-19, 76:14-19).  Additionally, Mr. Cox refused to sit down during the meeting, but maintains that he did not turn his back on Ms. Kerr or Mr. Fortin.  *Id*. at 8 (Cox Dep. 72:4-6).

objectives.  Docket No. 38-14.  On May 11, 2010, Mr. Cox responded to Ms. Kerr and told her that he did not attend the weekly meetings because he was subject to harassment at the meetings.  Specifically, he stated that he and Mary Romero, a fellow employee, were called "the bugs" the last time he attended a weekly meeting.[3]  Docket No. 38-9 at 1.  Mr. Cox also stated that he would never have a fair review at Lockheed Martin because management would find some reason to place him on a PIP.  *Id*.

In June 2010, Tom Molloy replaced Ms. Kerr as Mr. Cox's manager.  Docket No. 38-3 at 7 (Cox Dep. 144:16-18).  On June 28, 2010, Mr. Molloy asked Mr. Cox to re-enter his flow-down objectives for 2010.  Docket No. 38-17 at 1-2.  Mr. Molloy explained to Mr. Cox that every employee at Lockheed Martin was required to enter personal objectives as well as those that "flowed down from Senior Management."  *Id*.  In addition, Mr. Molloy told Mr. Cox that his current objective of timely completing his timecard did not qualify as a legitimate objective.  *Id*.  On July 14, 2010, Mr. Molloy also provided Mr. Cox with a copy of Lockheed Martin's Corporate Policy CPS-503, which indicates that employees are required to document information that flowed down from senior management in their PM process file.  Docket No. 38-18 at 2.  Mr. Cox told Mr. Molloy that he did not believe that CPS-503 required that he change his PM objectives.  *Id*.

---

[3]On May 21, 2010, Ms. Romero, a quality assurance engineering staff member, complained that she and Mr. Cox were called "the bugs" during a staff meeting.  Docket No. 39-2 at 10-11.  Evelyn Burch, a Lockheed Martin Equal Employment Opportunity Programs ("EEOP") investigator, investigated Ms. Romero's complaint.  *See* Docket No. 39-2.

On August 4, 2010, Ms. Burch met with Mr. Cox to discuss the incident during which he and Ms. Romero were called "the bugs."  Docket No. 38-16 at 2.  During this meeting, Mr. Cox told Ms. Burch that he had no confidence in management at Lockheed Martin and revealed that his participation in previous EEOP investigations had made his work conditions worse.  *Id.* at 3.  Ms. Burch's notes from the August 4, 2010 meeting also show that Mr. Cox believed that, although he was treated differently from other employees, it was "not a racial thing."  Docket No. 38-16 at 5.  Mr. Cox, however, disputes this fact and states that he told Ms. Burch that "Lockheed Martin had a culture where nonwhites were not accepted as part of the team no matter how good they were."[4]  Docket No. 43-1 at 2, ¶ 6.

On August 5, 2010, Mr. Molloy and Mandi Stites, senior manager of HR, met with Mr. Cox to discuss his flow-down objectives.  Docket No. 38-18 at 2.  Ms. Stites informed Mr. Cox that his failure to complete his PM objectives would result in charges of insubordination.  *Id.* at 3.  During the meeting, Mr. Cox chose not to sit down.  *Id.*; *see also* Docket No. 38-3 at 9 (Cox Dep. 156:11-17).  Mr. Molloy testified that Mr. Cox's refusal to sit down did not violate Lockheed Martin's policies, but the combination of him standing up, clenching his jaw, and unclenching his fist made other employees uncomfortable.  Docket No. 43-12 at 2 (Molloy Dep. 43:17-21).  Mr. Molloy, however, did not tell Mr. Cox that other employees were concerned about his behavior during meetings.  *Id.* at 3 (Molloy Dep. 46:12-21, 48:3-10).  Ms. Stites also testified that she thought it was disrespectful that Mr. Cox did not make eye contact during meetings.

---

[4]Mr. Cox told Ms. Burch that he was certain that he would placed on a PIP because Ms. Romero had been placed on a PIP.  Docket No. 43-1 at 1, ¶ 2.

Docket No. 43-4 at 5 (Stites Dep. 95:12-24).  However, Ms. Stites did not relay this

information to Mr. Cox.  *Id*.

On August 9, 2010, Mr. Cox met with Ms. Kerr and Mr. Molloy to discuss his

flow-down objectives.  Docket No. 38-18 at 3.  According to Mr. Molloy's meeting notes,

Mr. Cox again refused to include the flow-down objectives in his PM process file,

refused to participate in a discussion about his performance expectations, and told Mr.

Molloy and Ms. Kerr to place him on a PIP.  *Id*.  Mr. Cox states that he did not tell Ms.

Kerr and Mr. Molloy to place him on a PIP.  Docket No. 43-1 at 2, ¶ 10.

On September 24, 2010, Mr. Molloy and Ms. Stites informed Mr. Cox that he

would be placed on a PIP.  Docket No. 38-20.  The PIP required Mr. Cox to, among

other things, enter his flow-down objectives, identify at least three or more flow-down

objectives in his PM process file, attend daily and weekly meetings with his group, and

attend weekly PIP meetings with Mr. Molloy.  Docket No. 38-22.  According to Ms.

Stites' meeting notes, Mr. Cox refused to sign the PIP and said that he would not honor

the terms of the PIP.[5]  *Id*.  In response, Ms. Stites informed Mr. Cox that, although he

did not have to sign the PIP, he was expected to meet the objectives listed therein.[6]  *Id*.

---

[5]Mr. Cox disputes these facts and states that, although he refused to sign the PIP, Docket No. 38-4 at 3 (Cox Dep. 180:3-6); *id*. at 11 (Cox Dep. 240:14-17), he testified that he would comply with the terms of the PIP and do what his managers asked of him.  *Id*. at 2 (Cox Dep. 173:6-14); Docket No. 43-1 at 3, ¶ 17.

[6]In her deposition, Ms. Stites testified that there is no Lockheed Martin policy that identifies the difference between an employee signing or merely acknowledging a PIP. Docket No. 43-4 at 3 (Stites Dep. 85:16-25).  Ms. Stites testified that Lockheed Martin requires that an employee sign a PIP but, in the event an employee does not sign the PIP, that employee is still expected to perform the expectations of the PIP.  *Id*. at 2 (Stites Dep. 79:4-12-25).  Ms. Stites also indicated that refusing to sign a PIP or refusing to acknowledge a PIP is not an independently terminable offense.  *Id*. at 3

Later on September 24, 2010, Ms. Burch had a phone conversation with Mr. Cox.  Docket No. 38-4 at 3 (Cox Dep. 180:19-25).  Ms. Burch and Mr. Cox provide differing accounts of what happened.  According to Ms. Burch's interview notes, Mr. Cox said that Mr. Molloy and Ms. Kerr "have no idea" what he does at work and that he "wouldn't be on this PIP" if they knew how much work he did.  Docket No. 38-16 at 9.  Ms. Burch's notes also indicate that Mr. Cox also said that he was getting nosebleeds, something was "killing [him] inside," and that one of these days he would be found "slumped over [his] desk." *Id.*  at 10.  Mr. Cox also said that "[a] dog that has been beaten repeatedly will turn even on a good master.  There's been no apology made to me for the way I've been treated . . . [and] [e]very metal has a breaking point."  Docket No. 38-16 at 11.

Mr. Cox denies making these statements on September 24, 2010.  Docket No. 43-1 at 2-3, ¶¶ 13-16.  Mr. Cox claims that he made the statements regarding the abused dog and metal's breaking point on August 4, 2010, and that the comment about the dog was an analogy about the effect that certain acts of defendant had on Ms. Romero.  Docket No. 38-4 at 4 (Cox. Dep. 194:23-195:10, 196:11-15).  Mr. Cox denies stating that he has never received an apology for the way he was treated, but admits that he once told Ms. Burch that the pressures of his work caused him to have nosebleeds.[7]  Docket No. 43-1 at 2-3, ¶ 13.  Because she was concerned about Mr.

(Stites Dep. 86:7-20).  Ms. Stites stated that she has never terminated another employee for refusing to sign a PIP.  *Id.* (Stites Dep. 87:6-10).

[7]In its reply, defendant argues that Mr. Cox cannot rely on "his own uncorroborated, self-serving and conclusory statements . . . to establish genuine issues of material fact."  Docket No. 44 at 1 (citing *Salguero v. City of Clovis*, 366 F.3d 1168,

Cox's well-being, Ms. Burch testified that she told Monty Pierce, a Case Management

Team ("CMT") member, that Mr. Cox appeared angry and was experiencing some

health issues. *Id.* at 7 (Burch Dep. 73:8-12).  CMT is responsible for dealing with

individuals who are a risk factor to themselves or others.  Docket No. 38-10 at 7 (Burch

Dep. 74:13-18).  Thereafter, Mr. Cox took medical leave from September 7, 2010 to

October 4, 2010.[8]  Docket No. 39-1 at 8.

On October 7, 2010, Mr. Molloy, Ms. Kerr, and Ms. Stites discussed the

September 24, 2010 PIP with Mr. Cox.[9]  Docket No. 38-18 at 5.  According to Ms.

Stites' meeting notes, Mr. Molloy gave Mr. Cox an opportunity to acknowledge the

---

1177 n. 4 (10th Cir. 2004)).  However, defendant's reliance on *Salguero* in inapposite.
The court in that case refused to consider the plaintiff's testimony because the plaintiff
did not demonstrate that he had personal knowledge or corroborating evidence to show
a material issue of fact. *Id.*  Here, however, Mr. Cox's affidavit is based on his own
personal knowledge of the conversations he had with Ms. Burch and other Lockheed
Martin employees. *See Berry v. Chicago Transit Authority*, 618 F.3d 688, 691 (7th Cir.
2010) ("[W]e long ago buried—or at least tried to bury—the misconception that
uncorroborated testimony from the non-movant cannot prevent summary; judgment
because it is 'self-serving.'  If based on personal knowledge or firsthand experience,
such testimony can be evidence of disputed material facts.  It is not for courts at
summary judgment to weigh evidence or determine the credibility of such testimony; we
leave those tasks to factfinders").  Accordingly, because the Court must resolve all
factual disputes in the light most favorable to the non-moving party, the Court assumes
that Mr. Cox made these statements during his meeting with Ms. Burch on August 4,
2010. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

[8]Ms. Burch's investigation notes reveal that, upon his return on October 4, 2010,
Mr. Cox said that he had no intention of completing the September 24, 2010 PIP.
Docket No. 38-16 at 14.  Mr. Cox denies making these statements to Ms. Burch.
Docket No. 43-1 at 3, ¶ 14.

[9]On October 6, 2010, Bill Floyd, a quality engineering manager, contacted Mr.
Molloy to discuss Mr. Cox's behavior at a meeting the three of them attended.  Docket
No. 38-18 at 1.  Specifically, Mr. Floyd told Mr. Molloy that Mr. Cox's abruptness in
conversation, his outward hostility, and his demeanor made him uncomfortable. *Id.*

objectives and successfully complete the PIP, which Mr. Cox refused to do. *Id*. Later

that day, Mr. Pierce asked Ms. Stites to investigate Mr. Cox with regards to allegations

of insubordination. Docket No. 43-3 at 3 (Stites Dep. 43:17-25). Ms. Stites, however,

did not advise Mr. Cox that he was under investigation. *Id*. at 4 (Stites Dep. 52:10-14).

Ms. Stites testified that insubordination is considered a performance-based issue

because it relates to an employee's failure to follow instructions. Docket No. 43-4 at 1

(Stites Dep. 58:11-15). Ms. Stites stated that, since the investigation was a

performance-based investigation, Mr. Pierce told her that she was not required to

contact Mr. Cox as part of the investigation.[10] *Id*. (Stites Dep. 59:8-25).

    In the morning of October 8, 2010, Mr. Cox asked Mr. Molloy for help with

inserting his flow-down objectives. Docket No. 39-1 at 9. Mr. Cox told Mr. Molloy that

he wanted to complete the first objective of his PIP by entering his PM process

objectives. *Id*. Mr. Molloy testified that, although Mr. Cox did not actually input his flow-

down objectives, he nonetheless credited[11] Mr. Cox for completing one paragraph of the

---

[10]Lockheed Martin Conduct and Disciplinary Acton for Salaried Employees states in pertinent part that: "The Administrative Review Committee . . . shall ensure that the employee who is accused of wrongdoing has been notified of the allegation, is given an opportunity to provide his or her account of the events to the appropriate investigator, and is provided an opportunity to submit a written statement before the case is referred to the ARC for disposition." Docket No. 43-11 at 4-5. Ms. Stites testified that, even though company policy states that an employee should be given the opportunity to submit a written statement before the case is referred to the ARC, it is company practice in performance-based investigations not to include a written statement from the individual. Docket No. 43-4 at 4 (Stites Dep. 107:17-23).

[11]Mr. Molloy testified that Mr. Cox attempted to comply with the PIP in other ways such as notifying him when he was not able to attend meetings. Docket No. 43-6 at 4 (Molloy Dep. 86:11-14).

September 24, 2010 PIP.  Docket No. 43-6 at 3 (Molloy Dep. 76:15-24); *Id.* at 4 (Molloy

Dep. 88:11-17).

Later that day, Ms. Kerr, Ms. Stites, and Mr. Molloy told Mr. Cox that Lockheed

Martin was worried about his well being due to some "disturbing behavior and

statements made over the last several months."  Docket No. 43-1 at 3, ¶ 15.  They

advised Mr. Cox that he would be removed from the work environment pending a formal

risk assessment performed by Dr. John Nicoletti, a clinical psychologist who specializes

in anger management.  Docket No. 39-1 at 9.

On October 15, 2010, Dr. Nicoletti performed Mr. Cox's risk assessment.  Docket

No. 39-3.  Dr. Nicoletti concluded that there was insufficient evidence to show that Mr.

Cox presented a risk of danger to himself or other co-workers.  *Id.* at 3.  However, Dr.

Nicoletti found that Mr. Cox had "engaged in behaviors that [ ] created Social and

Psychological Disruption."  *Id.*  Dr. Nicoletti recommended that Lockheed Martin require

Mr. Cox to follow nine behavioral expectations upon his return to work or be subject to

disciplinary action.  *Id.* at 12-13.

Based on Dr. Nicoletti's recommendations, Lockheed Martin presented Mr. Cox

with a revised PIP dated November 4, 2010, Docket No. 38-24, and a Return to Work

Expectations ("RTWE") document.  Docket No. 38-25; Docket No. 43-5 at 2 (Rule

30(b)(6) Dep. 6:2-24).  The RTWE stated, among other things, that Mr. Cox's failure to

abide by the terms of the November 2, 2010 PIP or refusal to comply with the PIP could

result in disciplinary action, including termination.  Docket No. 38-25 at 2.

On November 4, 2010, Mr. Cox met with Mr. Molloy, Ms. Kerr, and Ms. Stites to

discuss the RTWE and a PIP dated November 4, 2010.  Docket No. 39-1 at 11-13.  Ms.

11

Stites presented Mr. Cox with the revised PIP.  Docket No. 38-6 at 7 (Molloy Dep. 107:5-9).  Mr. Molloy testified that Mr. Cox refused to engage in any meaningful conversation about its contents, *id*. (Molloy Dep. 107:19-25); Docket No. 38-4 at 10 (Cox Dep. 233:11-13), refused to sign the PIP, returned his work badges to Ms. Kerr, and said that he knew where this meeting was going.  Docket No. 38-4 at 10 (Cox Dep. 234:8-235:17).  Mr. Cox testified that he refused to sign the revised PIP because his work performance had been satisfactory and Dr. Nicoletti had found that he was not a threatening individual.  *Id*.  Mr. Cox also believed that the behavioral requirements of the November 24, 2010 PIP were demeaning and unjustified.  *Id*.  On November 5, 2010, Mr. Cox was told that he would be suspended pending an investigation into charges of insubordination.  *Id*. at 9 (Cox Dep. 231:4-12).  This was the first time Mr. Cox was notified of the investigation Ms. Stites had started on October 7, 2010.  *Id*.; Docket No. 43-4 at 4 (Stites Dep. 108:7-13).

Ms. Stites' investigation focused on allegations that Mr. Cox exhibited insubordinate behavior when he: (1) failed to input his flow-down objectives; (2) refused to sign his September 24, 2010 PIP; (3) refused to engage in respectful discussions with his supervisors; and (4) refused to sign and/or acknowledge the revised PIP of November 4, 2010 and comply with the RTWE.  Docket No. 39-1 at 3-4.  At the conclusion of her report, Ms. Stites found that three of the four allegations against Mr. Cox were substantiated.  *Id*. at 14-15.  The results of Ms. Stites' investigation were then presented to the Administrative Review Committee ("ARC").  Docket No. 38-5 at 6 (Stites Dep. 69:12-24).

On December 3, 2010, the ARC and the Executive Review Committee ("ERC") unanimously recommended that Lockheed Martin terminate Mr. Cox's employment.[12] Docket 38-26.  The ARC and ERC concluded that Mr. Cox exhibited insubordinate behavior when he refused to (1) enter his flow-down objectives into the PM process, (2) acknowledge the September 24, 2010 PIP,[13] (3) engage in respectful discussions with his supervisors, and (4) acknowledge or sign the November 4, 2010 PIP or the RTWE. *Id*.  The ARC based its decision on all four allegations contained in the report, concluding that none of the individual allegations was more significant than any other.[14] Docket No. 43-5 at 3 (Rule 30(b)(6) Dep. 59:22-60:11).  Lockheed Martin also contacted Mr. Cox by telephone about his termination, but did not provide him with any information on the allegations of insubordination.  Docket No. 43-1 at 4, ¶¶ 24-25.

Mr. Cox appealed his termination to Rich Kludt, vice president of HR.  Docket No. 38-28 at 2-3.  In his appeal, Mr. Cox argued that he was not given an opportunity to present information regarding his termination and present "his side of the story."  *Id*.  In

---

[12]The ARC's recommendation of termination is dated August 18, 2010, Docket No. 38-26, while the ERC's concurrence is dated November 24, 2010.  *Id*.  Although Ms. Stites found the allegation that Mr. Cox had not completed his flow-down objectives was unsubstantiated, Docket No. 39-1 at 14, the ARC overruled her decision based on Mr. Cox's pattern of insubordinate behavior.  Docket No. 43-5 at 5 (Rule 30(b)(6) Dep. 72:13-73:4).

[13]The ARC relied on Ms. Stites' definition of "acknowledge" in reaching its conclusion.  Docket No. 43-5 at 4 (Rule 30(b)(6) Dep. 62:5-9).

[14]June Taylor, an ARC member, was aware of Mr. Cox's involvement in the investigation with respect to Mary Romero.  Docket No 43-5 at 4 (Rule 30(b)(6) Dep. 62: 21-25).  Moreover, Mary Robinson, another ARC member, knew that Mr. Cox had brought forward concerns with HR in 2007, but did not know the specifics of Mr. Cox's complaints.  *Id*. (Rule 30(b)(6) Dep. 63:6-11).

response to the appeal, Mr. Kludt requested that Mr. Cox submit all pertinent documentation no later than December 21, 2010.  *Id.*  Mr. Cox did not provide Mr. Kludt with any information.  Docket No. 38-4 at 15 (Cox Dep. 274:4-20).  On January 12, 2011, Lockheed Martin denied Mr. Cox's appeal.  Docket No. 38-29.

On December 2, 2010, Mr. Cox filed a charge of discrimination with the Colorado Civil Rights Division ("CCRD") and the Equal Employment Opportunity Commission ("EEOC").  Docket No. 1 at 2, ¶ 3.  On March 11, 2011, Mr. Cox received a Notice of Right to Sue from the EEOC.  *Id.* at ¶ 5.  On June 6, 2011, Mr. Cox commenced this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981 alleging that he was subject to (1) discrimination on the basis of race and (2) retaliation for participating in protected activity.  Docket No. 1 at 6-9.  On April 30, 2012, Lockheed Martin moved for summary judgment on all of plaintiff's claims.  Docket No. 38.

## II.  STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986).  In pursuing summary judgment, the moving party generally bears the initial burden of showing the absence of a genuine dispute concerning a material fact in the case.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  However, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary

14

judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001).

"Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver,* 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex,* 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324; *see* FED. R. CIV. P. 56(e).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. However, to be clear, "it is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit." *Alpine Bank v. Hubbell,* 555 F.3d 1097, 1110 (10th Cir. 2009).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson,* 477 U.S. at 248).

## III. ANALYSIS

### A.  Discrimination Based on the September 24, 2010 PIP

In his first claim for relief, Mr. Cox alleges that Lockheed Martin discriminated against him because of his race in violation of 42 U.S.C. § 1981 and Title VII by placing him on a PIP on September 24, 2010.[15]  Docket No. 1 at 6-7.  "In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (quoting *Baca v. Sklar*, 398 F.3d 1210, 1218 n. 3 (10th Cir. 2005)); *accord Barlow v. C.R. England, Inc.*, --- F.3d ----, 2012 WL 6685467, at *5 (10th Cir. Dec. 26, 2012).

Mr. Cox, however, has not presented any direct evidence that racial animus played a role in his placement on the September 24, 2010 PIP.  Absent direct evidence of race discrimination, the Court will apply the burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973).  *See Crowe v. ADT Sec. Servs. Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011).  Under the *McDonnell Douglas* three-step analysis, plaintiff must first prove a prima facie case of discrimination.  *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).  To set forth a prima facie

---

[15]Title VII makes it unlawful "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  42 U.S.C. § 1981 states: "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

case of discrimination, a plaintiff must establish that he (1) is a member of a protected class, (2) was qualified and satisfactorily performing his job, and (3) suffered an adverse employment action under circumstances giving rise to an inference of discrimination. *See Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998); *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012); *Equal Employment Opportunity Commission v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007) (citing *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005)).[16] The burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action. *See Garrett*, 305 F.3d at 1216. If the defendant does so, the burden then shifts back to the plaintiff to show that his protected status was a determinative factor in the employment decision or that the employer's explanation is pretext. *Id*. Here, it is undisputed that Mr. Cox meets the first two elements of his prima facie case. Defendant, however, argues that Mr. Cox does not sufficiently show that his placement on a PIP on September 24, 2010 occurred under circumstances giving rise to an inference of unlawful discrimination. Docket No. 38 at 13-14.

---

[16] *See PVNF*, 487 F.3d at 800 n.5 ("There exists some tension in our case law regarding what a plaintiff must establish as part of his or her prima facie case of discrimination. Some cases treat circumstances suggestive of discrimination as an element of a prima facie case; other cases treat the surrounding circumstances as part of the analytically subsequent inquiry into the employer's stated reason for the challenged action and the plaintiff's opposing demonstration of pretext. *Sorbo*, 432 F.3d at 1173 & n.5 (listing cases). Regardless of whether we analyze the plaintiff's evidence 'in reference to the prima facie case or the business justification versus pretext inquiry, . . . if the court correctly concludes that the evidence of discrimination/pretext fails as a matter of law, summary judgment for the defendant is the proper result.' *Id.* at 1173.").

Defendant claims that Mr. Cox was placed on a PIP for his repeated failure to follow instructions from his managers and enter his flow-down objectives in accordance with company policy.  *Id*. at 14-15.  In his response, Mr. Cox presents no evidence to rebut this claim.  Based on the evidence in the record, it is clear that Mr. Cox was placed on a PIP on September 24, 2010 because of his refusal to enter his flow-down objectives in his PM process file despite several warnings from his supervisors.  *See* Docket No. 38-15 at 1; Docket No. 38-9 at 2; Docket No. 38-18 at 2.  Therefore, Mr. Cox fails to show that the September 24, 2010 PIP was issued under circumstances giving rise to an "inference of discrimination."  *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012).  Because Mr. Cox fails to raise a genuine issue of material fact with respect to the September 24, 2010 PIP, the Court finds that defendant is entitled to summary judgment on plaintiff's first claim.

**B.   Discriminatory Termination**

In his third claim for relief, Mr. Cox alleges that he was terminated on December 3, 2010 because of his race.  Docket No. 1 at 8-9.  As noted above, without direct evidence of discrimination, Mr. Cox must rely on the three-part, burden-shifting framework set out in *McDonnell Douglas*.  Under this framework, Mr. Cox must first establish a prima facie case of discrimination.  *Khalik*, 671 F.3d at 1192.  Only after Mr. Cox clears this initial hurdle does the burden shift to the employer to prove a "legitimate, non-discriminatory reason for the adverse employment action."  *Id*.  If Mr. Cox does not establish a prima facie case, his claim fails.  *McDonnell Douglas*, 411 U.S. at 802 ("The complainant in a Title VII trial must carry the initial burden under the statute of

18

establishing a prima facie case of racial discrimination."). Here, it is undisputed that Mr.

Cox meets the first two elements of his prima facie case. Defendant, however, argues

that Mr. Cox does not sufficiently show that his termination occurred under

circumstances giving rise to an inference of unlawful discrimination. Docket No. 38 at

13-14.

"The critical prima facie inquiry in all cases is whether the plaintiff has

demonstrated that the adverse employment action occurred under circumstances which

give rise to an inference of unlawful discrimination." *Plotke v. White*, 405 F.3d 1092,

1100 (10th Cir. 2005) (citation and quotations omitted). In order to establish the third

prong of a prima facie case, Mr. Cox can present evidence of "preferential treatment

given to employees outside the protected class," "actions or remarks made by [a]

decision maker," or circumstances related to "the timing or sequence of events leading

to" his termination. *Id.* at 1101 (citation and quotation omitted). The real question is

"whether a plaintiff has shown actions taken by the employer from which one can infer,

if such actions remain unexplained, that it is more likely than not that such actions were

based on a discriminatory criterion." *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296

F.3d 1177, 1181 (10th Cir. 2002) (internal quotation and citation omitted).

Mr. Cox presents four arguments to show that his termination arose under

circumstances giving rise to an inference of discrimination. First, Mr. Cox argues that

he was treated differently than other similarly situated employees because he was

supposedly terminated for refusing to sign his PIP while similarly situated employees

outside of his suspect class kept their employment for the same offenses. Docket No.

43 at 13. Second, Mr. Cox claims that defendant provided inconsistent reasons to

support the decision to terminate his employment.  *Id*. at 14.  Third, Mr. Cox contends

that defendant's stated reasons for termination are false.  *Id*.  Finally, Mr. Cox asserts

that defendant failed to follow its own policies and procedures when investigating

plaintiff's insubordination.  *Id*. at 16-17.  The Court assumes, without deciding, that

these four factors are sufficient for plaintiff to establish his prima facie case of

discrimination based on race.[17]

Accordingly, under *McDonnell Douglas*, the burden then shifts to defendant to

demonstrate a legitimate, non-discriminatory reason for its termination decision.

Defendant asserts that it terminated Mr. Cox's employment due to his (1) refusal to

enter management's flow-down objectives, (2) refusal to sign the September 24, 2010

PIP, (3) refusal to engage in respectful discussions with his supervisors, and (4) refusal

to acknowledge and sign the November 4, 2010 PIP and RTWE.  Docket No. 38-26.

Because these are reasons that are not facially prohibited, defendant has satisfied its

burden to produce legitimate non-discriminatory reasons for terminating Mr. Cox's

employment.  *See Stinnett v. Safeway, Inc.,* 337 F.3d 1213, 1218 (10th Cir. 2003).

Therefore, the burden shifts back to Mr. Cox to show that defendant's stated

reasons are pretext for unlawful discrimination.  To defeat summary judgment, Mr. Cox

must show that there is a genuine dispute of material fact as to whether defendant's

explanations for terminating his employment are pretextual.  *See Mickelson v. N.Y. Life

Ins. Co.*, 460 F.3d 1304, 1318 (10th Cir. 2006).  Mr. Cox relies on four pieces of

---

[17]The Court notes that plaintiff does not fully address the prima facie standard in
his opposition to the motion for summary judgment despite the fact that it is his burden
to make out a prima facie case.

circumstantial evidence to establish pretext: (1) evidence that defendant treated him differently than similarly situated employees; (2) evidence that defendant gave a false explanation for Mr. Cox's termination; (3) evidence of allegedly inconsistent and contradictory reasons that defendant gave to terminate Mr. Cox's employment; and (4) procedural irregularities that allegedly occurred in the course of Mr. Cox's investigation for insubordination.  Docket No. 43 at 12-17.

### 1.  *Similarly Situated*

Mr. Cox contends that defendant's stated reasons for his termination are pretextual because two similarly situated employees outside of his protected class, Steve Moody and Mary Romero, were not terminated even though they refused to sign PIPs issued by defendant.[18]  Docket No. 43 at 13.  Moreover, Mr. Cox argues that Ms. Stites testified that she knows of no other employee who has been terminated for refusing to sign his PIP.  Docket No. 43-4 at 3 (Stites Dep. 87:6-10).

Individuals are considered similarly situated "when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.'"  *PVNF,* 487 F.3d at 801 (quoting *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006)); *see also Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 922 (10th Cir. 2004) ("[c]omparison of one disciplinary action with another ordinarily is relevant only to show the bias of the

---

[18]Steve Moody, a white male supervised by Mr. Molloy, refused to sign his PIP and was not subject to termination.  Docket No. 43-6 at 2 (Molloy Dep. 63:17-25).  In addition, Ms. Romero, a Hispanic employee placed on a PIP by Ms. Kerr, refused to sign her PIP and was not threatened with a charge of insubordination.  Docket No. 43-2 at 1, ¶ 4.

person who decided upon the disciplinary action").  The Tenth Circuit has noted that differences in how different employees are treated "may be explained by the fact that discipline was administered by different supervisors, or that the events occurred at different times when the company's attitudes toward certain infractions were different, or that the individualized circumstances surrounding the infractions offered some mitigation for the infractions less severely punished." *EEOC v. Flasher Co.*, 986 F.2d 1312, 1320 (10th Cir. 1992) (citations omitted).  In some cases, there may be "no rational explanation for the differential treatment" between employees "other than the inevitability that human relationships cannot be structured with mathematical precision, and even that explanation does not compel the conclusion that the defendant was acting with a secret, illegal discriminatory motive." *Id.*

In the present case, the dissimilarities between the allegedly comparable situations of Ms. Romero and Mr. Moody and Mr. Cox's own dismissal are too great to warrant an inference of discriminatory animus.  It is undisputed that the ARC and the ERC terminated Mr. Cox's employment not simply because of his failure to sign two PIPs, but also because he was disrespectful to his supervisors, refused to enter his flow-down objectives, and refused to abide by the RTWE.  Docket No. 38-26; Docket No. 43-5 at 3 (Rule 30(b)(6) Dep. 59:22-60:11).  Although Mr. Cox alleges that Mr. Moody and Ms. Romero are similarly situated to him, he does not present evidence showing that they were accused of comparably serious violations.  *See Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (plaintiff may show pretext by "providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness");

*McGowan*, 472 F.3d at 745 ("[e]ven employees who are similarly situated must have been disciplined for conduct of 'comparable seriousness' in order for their disparate treatment to be relevant").  Without this evidence, Mr. Cox fails to show that his conduct was sufficiently similar to that of Ms. Romero and Mr. Moody.  Accordingly, the Court finds that Mr. Cox has failed to show that Mr. Moody and Ms. Romero were charged with offenses of "comparable seriousness" and, because there are significant differences between their circumstances, he does not show that they are similarly situated.

### 2.   False Explanation

Next, Mr. Cox argues that one of the reasons provided by defendant for his termination – that Mr. Cox refused to acknowledge and abide by the terms of the RTWE – is pretextual.  Docket No. 43 at 14.  In support, Mr. Cox states that paragraph 2 of the RTWE required that he "acknowledge and sign the revised Performance Improvement Plan dated November 2, 2010."  Docket No. 38-25 at 1.  In addition, paragraph 6b of the RTWE required that Mr. Cox "sign, acknowledge or comply with the revised PIP."  *Id*. at 2.  Mr. Cox claims that, because defendant presented a revised PIP dated November 4, 2010 and not November 2, 2010, he was never given an opportunity to comply with paragraphs 2 and 6b of the RTWE.  Docket No. 43 at 14.

"In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).  "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or

correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (alterations in original) (internal quotation marks omitted) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).  "In determining whether the proffered reason for a decision was pretextual, 'we examine the facts as they appear to the person making the decision.'"  *Watts v. City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001) (quoting *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir. 2001)).  "An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998).  The Court's role is to prevent and redress employment discrimination, and not to act as a "'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."  *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (quoting *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2004)).

The Court finds that Mr. Cox does not show that defendant's reason for terminating his employment was pretextual.  First, the RTWE identifies several behavioral expectations that Mr. Cox was required to follow upon his return to work. Docket No. 38-25.  As noted above, Mr. Cox testified at his deposition that he would not comply with these behavioral requirements because he found them demeaning. Docket No. 38-4 at 10 (Cox Dep. 235:1-7).  Moreover, Mr. Cox admitted that he refused

to acknowledge and sign the November 4, 2010 PIP.[19]  *Id*. at 11 (Cox Dep. 240:17-20).

In a challenge involving pretext, "[i]t is the manager's perception of the employee's

performance that is relevant, not plaintiff's subjective evaluation of his own relative

performance."  *Furr v. Seagate Tech., Inc*., 82 F.3d 980, 988 (10th Cir. 1996).  The fact

that the RTWE identified a date of November 2, 2010 for the revised PIP, while the

revised PIP presented to Mr. Cox was dated November 4, 2010 does not give rise to an

inference that defendant's stated reason for termination was false.  *Flasher*, 986 F.2d at

1322 n. 12 ("a mistaken belief can be a legitimate reason for an employment decision

and is not necessarily pretextual").  Based on the evidence presented to the ARC and

the ERC, it was reasonable to believe that Mr. Cox would not comply with any PIP that

included a list of behavioral expectations.  *Tesh v. U.S. Postal Serv*., 349 F.3d 1270,

1273 (10th Cir. 2003) (noting that in pretext, the question is not whether employer's

---

[19]Mr. Cox stated in his affidavit dated May 17, 2012, and attached to his
response that "[o]n November 4, 2010, [he] accepted the PIP.  I was never told how to
acknowledge the PIP.  I engaged in conversations and asked a number of questions
about the revised PIP."  Docket No. 43-1 at 3.  The affidavit contradicts Mr. Cox's earlier
deposition testimony of November 9, 2011, in which he admitted that he refused to sign
and acknowledge the revised PIP.  Docket No. 38-4 at 11 (Cox Dep. 240:17-20).  In
*Bohn v. Park City Group, Inc.*, 94 F.3d 1457, 1463 (10th Cir. 1996), the Tenth Circuit
found than an affidavit that contradicts earlier deposition testimony should not be
considered.  In *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986), the Tenth
Circuit held that an affidavit that contradicts earlier sworn testimony should only be
disregarded if it "constitutes an attempt to create a sham fact issue."  Under the more
lenient *Franks* standard, the Court will disregard Mr. Cox's later contradictory affidavit
because it appears to be an attempt to create a sham issue.  Mr. Cox's statement is
wholly inconsistent with his deposition testimony which states that he would not sign or
follow the November 4, 2010 PIP because it was demeaning.  Furthermore his May 17,
2012 affidavit is not based on evidence that was not available to him at the time of his
deposition.  *See Franks*, 796 F.2d at 1237 (noting that whether affiant had access to
the pertinent evidence at the time of his earlier testimony is relevant to whether a sham
fact issue exist).

stated reason for the plaintiff's termination was factually accurate, but whether the employer "reasonably 'perceived' that it was accurate.").  Simply because the date listed on the revised PIP varied slightly from the RTWE does not make the ARC's and the ERC's belief any less credible.  Accordingly, because the ARC and the ERC had a good faith belief that Mr. Cox failed to comply with the RTWE, Mr. Cox has not raised an issue of material fact regarding defendant's explanation for his termination.  *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1179 (10th Cir. 2006).

### 3.   *Inconsistent and Contradictory Reasons for Termination*

Mr. Cox next argues that defendant offered two inconsistent explanations for his termination.  Docket No. 43 at 12.  First, Mr. Cox asserts that defendant's shifting rationale between "signing" and "acknowledging" a PIP shows this reason for termination is pretextual.  Docket No. 43 at 13.  Second, Mr. Cox claims that, because he was not disrespectful to leadership, this reason for termination is contradictory.  *Id*. at 15-16.

Mr. Cox can demonstrate pretext by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action."  *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997); *see also Miller v. Eby Realty Grp. LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005).  Evidence of an inconsistent reason for termination is only helpful to a plaintiff if "the employer has changed its explanation under circumstances that suggest dishonesty or bad faith."  *See Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1310 (10th Cir. 2005).

Mr. Cox claims that the ARC and the ERC first found that he was insubordinate for failing to "sign" the September 24, 2010 PIP, but then found that he was insubordinate for "refusing to acknowledge and sign" the November 4, 2010 PIP. Docket No. 38-26 at 1.  Mr. Cox argues that he was never advised about the difference between signing a PIP and acknowledging a PIP.  Docket No. 43-1 at 3, ¶ 17.  He asserts that defendant does not have a clear definition for the differences between "sign" and "acknowledge" and adopted Ms. Stites' definition.  Docket No. 43-5 at 4 (Rule 30(b)(6) Dep. 62:5-9).

The Court finds that, while defendant may have relied on both Mr. Cox not signing his PIPs and not acknowledging his PIPs, defendant's explanations for Mr. Cox's termination have not been inconsistent.  *Jaramillo*, 427 F.3d at 1311 ("Courts have looked to two factors to evaluate a change in the employer's explanation for an employment decision: (1) the timing of the change in position and (2) the evidentiary basis for the new rationale.").  The evidence in the record shows that, during the week of October 4, 2010 to October 8, 2010, Mr. Cox made some effort to comply with the September 24, 2010 PIP by attending group meetings, Docket No. 43-6 at 4 (Molloy Dep. 86:11-14), and even once approached Mr. Molloy to enter his flow-down objectives.  *Id*. at 3 (Molloy Dep. 76:17-24).  However, as noted in the investigation report, Mr. Cox was found to be insubordinate, not for failing to comply with the September 24, 2010 PIP, but for repeatedly indicating that it was not his PIP and that he would not follow the PIP.  Docket No. 39-1 at 14.  In addition, although Ms. Stites states that it is unclear whether the distinction between "acknowledging" and "signing" the PIP was made clear to Mr. Cox on September 24, 2010, *id*. (Stites Dep. 85:4-8), it is

27

undisputed that Mr. Cox refused to acknowledge and sign the November 4, 2010 PIP.
Docket No. 38-4 at 11 (Cox Dep. 240:14-20).

Based on this evidence, defendant has not changed its rationale between
"signing" and "acknowledging" in order to "mask an illegitimate motive." *Jaramillo*, 427
F.3d at 1310.  On the contrary, defendant's explanation for finding that Mr. Cox did not
acknowledge the PIP is based on Mr. Cox's repeated statements that the September
24, 2010 PIP was "unjustified."  Docket No. 38-4 at 2 (Cox Dep. 173:5-14, 174:6-9).  As
Ms. Stites testified, although there is no Lockheed Martin policy defining what it means
to acknowledge a PIP, an employee can acknowledge a PIP by "[a]gree[ing] to abide by
the PIP, understand that this is a PIP document that needs to be completed."  Docket
No. 43-4 at 2 (Stites Dep. 79:21-24).  In this case, it is clear that Mr. Cox never
acknowledged his PIPs, signed his PIPs, or stated that he understood it was a
document that had to be completed.  Based on these facts, the Court finds that the
distinction between signing and acknowledging a PIP would not cause a rational
factfinder to discount the legitimacy of defendant's non-retaliatory explanation for Mr.
Cox's termination.  *Jaramillo*, 427 F.3d at 1310 (inconsistency evidence is only helpful
to a plaintiff if "the employer has changed its explanation under circumstances that
suggest dishonesty or bad faith").

Next, Mr. Cox contends that, because he was not disrespectful to his
supervisors, defendant's stated reason for terminating his employment is contradictory.
Docket No. 43 at 15-16.  Mr. Cox claims that, although he stood up during meetings,
Mr. Molloy, Ms. Stites, and Ms. Kerr never insisted that he sit down or that he make
more eye contact.  *Id*.  In addition, Mr. Cox states that neither Mr. Molloy, Ms. Stites,

28

nor any other employee at Lockheed Martin told him that they viewed his behavior negatively. *Id*.

Even assuming Mr. Cox subjectively believed he did not have a poor attitude, "[i]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of [his] own relative performance." *Furr*, 82 F.3d at 988. The evidence in the record shows that Mr. Cox clenched his fists during meetings, Docket No. 43-12 at 2 (Molloy Dep. 43:17-21), wore headphones during meetings, Docket No. 38-2 at 9 (Cox Dep. 74:11-19), responded in an untimely manner to email correspondence, repeatedly refused to enter his flow-down objectives, Docket No. 38-18 at 2, and elevated his voice when talking to Mr. Molloy.  Based on the foregoing, the Court finds that no reasonable juror could find that Mr. Molloy, Ms. Stites, the ARC, and the ERC did not genuinely perceive Mr. Cox as having inadequate interpersonal skills or failing to show respect for his supervisors.  Accordingly, Mr. Cox has not raised a genuine issue of material fact regarding defendant's explanation that Mr. Cox was terminated, in part, because of a lack of adequate interpersonal skills and failure to respect his supervisors.

### 4.  *Defendant's Actions were Contrary to Established Policies*

Finally, Mr. Cox argues that defendant's failure to seek his response to the allegations of insubordination is sufficient to show that its reasons for terminating him were a pretext for discrimination.  Docket No. 43 at 17.  Mr. Cox argues that, pursuant to defendant's policies, the ARC was required to provide him with an opportunity to

29

respond to his charges of insubordination.[20]  *Id.*  Moreover, Mr. Cox states that Mr.

Pierce, a member of the CMT and ARC, told Ms. Stites that she did not have to contact

Mr. Cox in the course of her investigation.  Mr. Cox argues that defendant's failure to let

him defend his charge of insubordination is evidence of pretext.[21]  Docket No. 43 at 17.

The fact that a "defendant acted contrary to a written company policy prescribing

the action to be taken by the defendant under the circumstances" may in an appropriate

case give rise to a fact issue regarding pretext.  *Kendrick*, 220 F.3d at 1230.  The Tenth

Circuit has held "disturbing procedural irregularities surrounding an adverse

employment action may demonstrate that an employer's proffered nondiscriminatory

business reason is pretextual."  *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122

(10th Cir. 2007).  However, "[t]he mere fact that an employer failed to follow its own

internal procedures does not necessarily suggest that the substantive reasons given by

the employer for its employment decision were pretextual."  *Berry v. T-Mobile USA, Inc.*,

---

[20]Lockheed Martin Conduct and Disciplinary Action for Salaried Employees states in pertinent part, that: "The Administrative Review Committee . . . shall ensure that the employee who is accused of wrongdoing has been notified of the allegation, is given an opportunity to provide his or her account of the events to the appropriate investigator, and is provided an opportunity to submit a written statement before the case is referred to the ARC for disposition."  Docket No. 43-11 at 4-5.

[21]Mr. Cox argues that Jerry Honea, a white male employee, was terminated on August 16, 2009 for insubordination for refusing to attend meetings, working outside of core hours, and refusing to follow management's directives was notified of the charge lodged against him and afforded an opportunity to respond to the allegations.  Docket No. 43-10 at 2-3.  Mr. Cox, however, does not show that Mr. Honea is similarly situated to him as he provides no evidence of Mr. Honea's work title or the identify of Mr. Honea's supervisor.  *See Flasher*, 986 F.2d at 1320 (finding that discipline by different supervisors or discipline occurring at a different times may explain the differences in how different employees are treated)

490 F.3d 1211, 1222 (10th Cir. 2007) (alteration omitted) (internal quotation marks omitted).

"[T]he standard for establishing pretext requires evidence of not just any procedural shortfall, but of a 'disturbing procedural irregularity,'" often exemplified by an "employer's 'falsifying or manipulating of relevant criteria.'"  *Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686, 696 (10th Cir. 2008) (citations omitted).  Moreover, an employee's mere allegation that his employer deviated from company policy is insufficient to prove pretext; rather, the employee must present evidence that the employer believed that a relevant company policy existed and chose to deviate from the policy in spite of that belief.  *See Cooper*, 296 F. App'x at 696 (finding that the employer's failure to "seek out the employee's side of the story" was contrary to company policy, but did not amount to a "disturbing procedural irregularity" where the employee failed to present evidence that the employer believed that its policy required it to obtain the employee's side of the story); *Berry*, 490 F.3d at 1222 (stating that if the "decisionmakers did not believe a rigid policy existed," their mistake in failing to follow it does not show pretext).

It is undisputed that defendant did not contact Mr. Cox over the course of its investigation.  However, according to Ms. Stites, even though Lockheed Martin's policy states that an employee should be given the opportunity to submit a written statement before the investigation is referred to the ARC, it had been company practice in performance-based investigations for several years not to include a written statement from the accused employee.  Docket No. 43-4 at 4 (Stites Dep. 107:17-23).  Moreover, Ms. Stites testified that, pursuant to company policy, insubordination is considered a

performance-based issue because it relates to an employee's failure to follow instructions. *Id*. at 1 (Stites Dep. 58:11-15). Thus, because Mr. Cox's investigation was performance-based, Ms. Stites testified that defendant was not required to contact Mr. Cox over the course of the investigation. *Id*. at 1 (Stites Dep. 59:8-25).

The Court finds that Ms. Stites' interpretation of defendant's policy does not constitute a "disturbing procedural irregularity." The policy is called "Conduct and Disciplinary Action" and by its terms the policy applies to employees accused of "wrongdoing," as opposed to employees being disciplined for substandard work. In addition, Mr. Cox has not shown that defendant had a rigid policy of interviewing an accused employee before concluding a performance-based investigation. *Berry*, 490 F.3d at 1222 (finding that, because it is undisputed that decisionmakers did not believe a rigid policy existed, "even if the failure to [follow procedure] was a mistake, it was not pretextual") (citation omitted). Based on these facts, Mr. Cox has not proffered evidence showing that defendant's failure to interview him is evidence of a disturbing procedural irregularity. *Cooper*, 296 F. App'x at 696 (finding that establishing pretext requires evidence "of not just any procedural shortfall, but of a 'disturbing procedural irregularity . . . often exemplified by an employer's 'falsifying or manipulating of relevant criteria'") (citations omitted). Accordingly, the Court finds that Mr. Cox fails to show that defendant's failure to interview him prior to making a termination decision is evidence of pretext. *Id*.

### 5.  *Conclusion*

The record in this case shows that Mr. Cox was terminated for his failure to implement flow-down objectives into the PM process, his refusal to abide by the terms of the September 24, 2010 PIP and the November 4, 2010 PIP, for repeatedly refusing to engage in respectful conversations with his supervisors, and for his refusal to abide by the RTWE established based on Dr. Nicoletti's evaluation.  Lockheed Martin had been trying to get Mr. Cox to comply with the PM process since 2009.  Viewing the evidence in a light most favorable to Mr. Cox, the evidence he presents does not show that defendant's stated reasons are so weak, implausible, inconsistent, incoherent, or contradictory that a reasonable jury could rationally find them unworthy of belief.  *Morgan*, 108 F.3d at 1323.  Accordingly, because Mr. Cox fails to raise a genuine issue of material fact with respect to the basis for his termination, the Court finds that defendant is entitled to summary judgment on plaintiff's third claim.

### C.  Retaliation

### 1.  *Prima Facie Case*

Mr. Cox argues that he was terminated for engaging in protected activity.  Docket No. 43 at 18.  Title VII makes it unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  To prevail on a Title VII retaliation claim, Mr. Cox must establish that retaliation played a part in the employment decision.  *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008).

One means by which Mr. Cox can establish retaliation is through a "mixed-motive" theory, wherein he may show direct evidence that retaliatory animus played a "motivating part" in the employment decision.[22]  *See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) (citation omitted).  However, because Mr. Cox presents no direct evidence showing a mixed motive, he may also show retaliation through the *McDonnell Douglas* framework.  *Id*.  Under this framework, Mr. Cox must first establish a prima facie case of retaliation by demonstrating that: (1) he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.  *Id*. at 998 (internal quotation marks omitted).  If Mr. Cox establishes a prima facie case of retaliation, then the burden-shifting analysis of *McDonnell Douglas* is applicable and defendant must articulate a legitimate, non-retaliatory reason for the challenged employment decision.  *Fye*, 516 F.3d at 1227.  If defendant meets this burden, then the plaintiff must prove retaliation by showing that defendant's proffered reason is pretextual.  *Id*.

Mr. Cox claims that he engaged in two instances of protected activity: (1) the May 21, 2010 email to Ms. Kerr notifying her that he and Ms. Romero were called "the bugs" during a staff meeting and (2) the August 4, 2010 interview with Ms. Burch when

---

[22]In *Fye*, the Tenth Circuit noted that a plaintiff "need not characterize [his or her case] as a mixed-motive or pretext case from the outset" but "[a]t some point, however, the plaintiff must" choose which framework he will pursue.  516 F.3d at 1225.  Here, plaintiff does not rely on direct evidence or "evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged [retaliatory] attitude."  *Twigg*, 659 F.3d at 1000.

he used the analogy about metal's breaking point and an abused dog.[23]   Docket No. 43

at 18.  The Court finds that these two events qualify as protected activity under Title VII.

*See* 42 U.S.C. § 2000e-3(a) ("[i]t shall be an unlawful employment practice for an

employer to discriminate against any of his employees . . . because he has made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding,

or hearing under this subchapter."); *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015

(10th Cir. 2004) ("[p]rotected opposition can range from filing formal charges to voicing

informal complaints to superiors").

Next, Mr. Cox alleges, and defendant does not dispute, that the commencement

of the ARC's investigation and disciplinary disposition constitutes an adverse

employment action.  Docket No. 43 at 19.  To qualify as adverse, an employer's action

must be sufficient to "dissuade" a reasonable worker from making a complaint or

supporting a charge of discrimination.  *Bertsch v. Overstock.com*, 684 F.3d 1023, 1028-

29 (10th Cir. 2012) (noting that, after the Supreme Court's decision in *Burlington N. &*

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), a plaintiff is no longer required to

show "a significant change in her employment status" in a prima facie case of

retaliation).  Here, the Court finds that the commencement of the ARC's investigation

on August 18, 2010 and the requirement that Mr. Cox undergo a risk assessment

---

[23]The Court notes that defendant disputes the date on which Mr. Cox made
analogies to an abused dog and metal's breaking point.  Docket Nos. 38, 43, 44
[Undisputed Material Fact Nos. 43-46].  However, as discussed above, because the
Court must draw all evidence and reasonable inferences in light of the nonmoving party
– Mr. Cox – the Court will analyze the retaliation claim as though Mr. Cox made these
statements to Ms. Burch on August 4, 2010.  *Stover v. Martinez*, 382 F.3d 1064, 1070-
71 (10th Cir. 2004).

evaluation constitute adverse employment actions because they are sufficient to dissuade an employee from supporting a charge of discrimination. *Id*.

Finally, Mr. Cox claims that he can show a causal connection because his participation in Ms. Romero's investigation triggered a series of actions which led to his termination on December 3, 2010.  Docket No. 43 at 18.  Mr. Cox argues that he can show causation because: (1) the ARC commenced termination proceedings on August 18, 2010;[24] (2) the CMT began an investigation about insubordination on October 7, 2010; (3) he was removed from the work premises for a risk assessment on October 8, 2010; and (4) he was placed on leave on November 5, 2010 for failure to abide by the November 4, 2010 PIP and the RTWE.  *Id*. at 19.

In a case of retaliation, a causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.  *Fye*, 516 F.3d at 1228; *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) ("a plaintiff may rely on temporal proximity alone only if the termination is very closely connected in time to the protected activity").

The Court finds that the two months between Mr. Cox's participation in protected activity (testifying about Ms. Romero's discrimination complaint) and the adverse employment actions (the commencement of the ARC termination process, the CMT

---

[24]Defendant's Rule 30(b)(6) witness stated that the date on ARC's investigation document was incorrect and that it should reflect a date of November 18, 2010.  Docket No. 43-5 at 4 (Rule 30(b)(6) Dep. 64:21-25).  However, viewing the evidence in a light most favorable to Mr. Cox, the Court finds that the ARC discharge action began on August 18, 2010.  *Id*.

investigation, and his removal for a risk assessment) are sufficient to establish a causal connection.  *See Anderson*, 181 F.3d at 1179 (assuming a period of approximately nine weeks was sufficient to establish a prima facie case of retaliation); *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1239-40 (10th Cir. 2004) (holding that a period of up to two to three months demonstrated causation for the purposes of establishing a prima facie case under Title VII).  Because Mr. Cox has satisfied his burden to establish a prima facie case of retaliation, defendant must now offer a legitimate, nondiscriminatory reason for Mr. Cox's termination.

### 2.   *Legitimate Non-Discriminatory Reason for Termination*

Establishing a legitimate, nondiscriminatory reason is a burden of production and "can involve no credibility assessment."  *Reeves*, 530 U.S. at 142.  As noted above, defendant asserts that it commenced a CMT investigation due to Mr. Cox's (1) refusal to enter management's flow-down objectives, (2) refusal to sign the September 24, 2010 PIP, (3) refusal to engage in respectful discussions with his supervisors, and (4) refusal to acknowledge or sign the November 4, 2010 PIP and RTWE.  Docket No. 38-26.  Additionally, defendant contends that it placed Mr. Cox on a PIP on September 24, 2010 because he refused to enter management's flow-down objectives into the PM process despite three separate warnings from Ms. Kerr, Mr. Molloy, and Ms. Stites.  *See* Docket No. 38-15 at 1; Docket No. 38-9 at 2; Docket No. 38-18 at 2.  Moreover, Mr. Cox was required to undergo a risk assessment because of the threatening nature of the statements he made to Ms. Burch.  Furthermore, Mr. Cox was terminated because defendant found that the four allegations of insubordination were substantiated.

37

Because these are legitimate, nondiscriminatory reasons for beginning an investigation for subordination, requiring Mr. Cox to undergo a risk assessment, and Mr. Cox's subsequent termination, the burden now shifts to Mr. Cox to show why defendant's nondiscriminatory reasons are pretextual.

### 3.  *Pretext*

To show pretext, Mr. Cox must "produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons."  *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006).

Mr. Cox's pretextual arguments rely predominantly on the same evidence discussed in relation to his race discrimination claim.  *See* Docket No. 43 at 11-17.  The Court has already found that these reasons are insufficient to establish pretext and there is nothing in the context of his retaliation claim that makes them more sufficient now.  However, Mr. Cox makes two arguments specifically related to his claim of retaliation.  Mr. Cox appears to argue that the ARC's decision to initiate termination proceedings on August 18, 2010 – leading to the October 7, 2010 investigation – and the decision to require that he undergo a risk assessment show that defendant's reasons for termination are pretextual.  Docket No. 43 at 20.

Mr. Cox claims insubordination was not a true reason for beginning the ARC termination process because, on August 18, 2010, most of the evidence of his alleged insubordination had yet to occur.  Docket No. 43 at 19-20.  Moreover, Mr. Cox claims

38

that he has provided sufficient evidence of retaliation given that June Taylor, an ARC member, was aware of Mr. Cox's participation in Ms. Romero's case since September 24, 2010.[25] *Id.*

The Court finds that Mr. Cox does not sufficiently show that the ARC's decision to commence the October 7, 2010 investigation was pretextual.  Mr. Cox does not rebut defendant's legitimate non-discriminatory reasons for beginning the investigation, namely, that he: (1) refused to enter his management flow-down objectives in the PM process file; (2) refused to sign the September 24, 2010 PIP; (3) refused to engage in respectful discussion with his leaders regarding his performance; and (4) refused to acknowledge and sign the November 4, 2010 PIP and RTWE.  *Id.* at 1-2.  To the extent plaintiff argues that defendant violated its own policies during the investigation, the Court finds that defendant's interpretation of a policy not to require interviewing him was reasonable and therefore defendant did follow its policy and that, even if defendant did fail to follow its policy, plaintiff fails to show that such policy was rigidly adhered to.  *See Berry*, 490 F.3d at 1222.

Mr. Cox claims that the decision to investigate his employment is tainted because Ms. Taylor, as a member of the ARC, knew about his participation in Ms. Romero's discrimination complaint.  Docket No. 43 at 20.  In her complaint of discrimination, Ms. Romero asserted that Kent Sorenson had called her and Mr. Cox "the bugs."  Docket No. 39-2 at 13.  Assuming Ms. Taylor was aware of these allegations, Mr. Cox does not explain why Ms. Taylor's knowledge of his involvement in

---

[25]June Taylor became a member of the ARC in May 2010.  Docket No. 38-10 at 10 (Burch Dep. 90:17-20).

Ms. Romero's complaint could lead a rational factfinder to infer that defendant's expressed reason for the investigation was pretextual.  *Argo*, 452 F.3d at 1203.

Next, Mr. Cox argues that he has sufficiently shown retaliation because he was required to perform a risk assessment based on comments he made during the investigation of Ms. Romero's complaint.  Docket No. 43 at 18-19.  However, Mr. Cox does not dispute that he used two analogies which led to CMT's decision to require a risk assessment.  Although Mr. Cox suggests that the comments referred to Ms. Romero, both of these analogies could be reasonably interpreted to constitute a threat to the safety of the workplace.  Ms. Burch testified that she approached Mr. Pierce because she was concerned that Mr. Cox was having some health issues and appeared angry.[26]  Docket No. 38-10 at 7 (Burch Dep. 73:8-12).  Moreover, it is undisputed that CMT also requested the risk assessment based on evidence provided by Mr. Molloy and Ms. Burch that Mr. Cox exhibited threatening behavior.  Docket No. 43-5 at 6 (Rule 30(b)(6) Dep. 73:18-25, 76:14-19).  Mr. Molloy's evidence consisted of the complaint brought forward by Mr. Floyd as well as Mr. Molloy's own interactions with Mr. Cox.  *Id*. (Rule 30(b)(6) Dep. 75:19-23).  Given these non-discriminatory reasons, the Court finds that Mr. Cox fails to show that the decision to have him undergo a risk assessment was pretextual.

In summary, Mr. Cox does not present sufficient evidence to show that defendant's stated reasons for the October 7, 2010 investigation, the risk assessment,

---

[26]Ms. Burch testified that she told Mr. Pierce about Mr. Cox's statements because of a presentation Dr. Nicoletti gave Lockheed Martin employees.  Docket No. 38-10 at 9 (Burch Dep. 82:6-18).

40

and subsequently his termination are pretextual.  Viewing the evidence in a light most favorable to Mr. Cox, Mr. Cox fails to demonstrate that defendant's non-discriminatory reasons are so weak, implausible, inconsistent, or incoherent that a reasonably jury could rationally find them unworthy of belief.  As a result, defendant is entitled to summary judgment on Mr. Cox's retaliation claim.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 38] is **GRANTED**.  It is further

**ORDERED** that the trial set for January 28, 2013 is **VACATED**.  It is further

**ORDERED** that, within 14 days of the entry of judgment, defendant may have its costs by filing a bill of costs with the Clerk of the Court.  It is further

**ORDERED** that this case is **CLOSED**.


DATED January 11, 2013.

BY THE COURT:


  s/Philip A. Brimmer_____
PHILIP A. BRIMMER
United States District Judge